# IN THE SUPREME COURT OF IOWA

No. 13–1061

Filed June 26, 2015

**STATE OF IOWA,**

Appellee,

vs.

**DONALD JOSEPH KING,**

Appellant.

---

Appeal from the Iowa District Court for Woodbury County, James D. Scott, Judge.

A criminal defendant challenges the admission of evidence collected by his parole officer in parolee defendant's home under the Iowa Constitution. **AFFIRMED.**

Rees Conrad Douglas, Sioux City, for appellant.

Thomas J. Miller, Attorney General, Martha E. Trout, Assistant Attorney General, Patrick A. Jennings, County Attorney, and Mark A. Campbell, Assistant County Attorney, for appellee.

**CADY, Chief Justice.**

In this appeal, we consider the constitutionality of a warrantless search of the home of a parolee by a parole officer that uncovered evidence used to prosecute and convict the parolee of the crime of possession of a controlled substance as a habitual offender. We must determine whether the search was unconstitutional or was justified by the special needs of the State, based on a balancing of the governmental interests served by the search against the privacy interest of the parolee protected under article I, section 8 of the Iowa Constitution. On our review, we find the search by the parole officer did not violate article I, section 8 of the Iowa Constitution. We affirm the judgment and sentence of the district court.

## I. Background Facts and Proceedings.

Donald King was released on parole from a correctional institution in Iowa on June 28, 2012. He was serving a sentence of incarceration at the correctional institution after being convicted of the crimes of possession of a controlled substance (methamphetamine), possession of a controlled substance (methamphetamine) with intent to deliver, and theft in the second degree. The parole officer assigned to supervise King while on parole was Emmanuel Scarmon. As a condition to his release, King was required to sign a "Parole Order and Agreement." The agreement contained numerous terms, including a consent-to-search provision and an agreement to abstain from the use, purchase, and possession of any drug.

King moved into an apartment in Sioux City and found employment. In September and October 2012, however, he tested positive for methamphetamine. He was placed into an inpatient drug-treatment program and returned to his apartment upon completing the

program on January 4, 2013. King was required to continue the drug-treatment program on an outpatient basis, and he was required to find employment. He was also required to wear an electronic monitoring bracelet, which would allow his probation officer to track his movements.

On January 14, Scarmon met with King at the probation office. During the meeting, King complained about the outpatient treatment program and seemed to be losing his motivation to succeed at parole. He expressed the notion that it might be easier to return to prison. In the days following the meeting, the monitoring system signaled that King had not left his apartment for two days. King was required to attend drug treatment and to look for employment during this time. The monitoring system also signaled that the bracelet might have been subjected to tampering. Scarmon was concerned that King was on the verge of another relapse into drugs or might abscond from parole.

On January 17, Scarmon and another parole officer, Todd Hruska, made a home visit to check on King. When Scarmon and Hruska arrived at the apartment, King was present and allowed them inside. King lived alone. Scarmon checked the monitoring bracelet worn by King. It did not show any signs of tampering. Scarmon then administered a breath test to determine if King had been consuming alcoholic beverages. The test did not detect the presence of any alcohol. King explained that he had not left his apartment over the last few days because he had been sick.

Scarmon had learned from experience that he could not always trust parolees to provide honest answers to his questions. The search provision in the parole agreement was a means for him to help verify if the information provided to him by parolees was correct. He also utilized home searches to make sure parolees were generally living in an

environment consistent with the goal of rehabilitation when questions and concerns would surface during the course of supervision. A search was an effective means to discover signs of inappropriate activity that could hamper the success sought by parole.

Scarmon decided he should check King's bedroom for signs of any activity detrimental to parole, including the presence of drugs or drug paraphernalia. He was aware of King's history of drug use, including intravenous use of drugs and drug use while on parole. After Scarmon informed King of his intention to search, King did not refuse, but instead led the parole officers to his basement bedroom. Scarmon promptly observed a sunglasses case located on the headboard of the bed. He opened the case and discovered two small bags of marijuana and rolling papers. Scarmon arrested King for violating his parole. Hruska placed a call to the police.

King was subsequently charged with one count of possession of marijuana, third offense, a class "D" felony, as a habitual offender. This charge was based on the marijuana found in his bedroom by Scarmon. King moved to suppress the marijuana as evidence in the prosecution. He claimed the search of his bedroom and sunglasses case violated article I, section 8 of the Iowa Constitution, and his consent to the search under the parole agreement did not constitute a waiver of his constitutional right. The State resisted the motion. It argued the search was valid either as a "special needs" search or as a "consent" search under the parole agreement. The district court overruled the motion, ultimately ruling that the search was supported under the special-needs doctrine.

At a bench trial, King was convicted of possession of a controlled substance, marijuana, third offense, as a habitual offender. The district

court sentenced King to a period of incarceration not to exceed fifteen years. The sentence was suspended, and King was placed on probation for two years. King appealed the judgment and sentence based on the denial of his motion to suppress.

## II. Standard of Review.

We review de novo claims based on the district court's failure to suppress evidence obtained in violation of the state constitution. *State v. Kern*, 831 N.W.2d 149, 164 (Iowa 2013).

## III. Analysis.

Article I, section 8 of the Iowa Constitution expresses "[t]he right of the *people* to be secure . . . against unreasonable seizures and searches," and requires warrants to be particularized and issued only upon probable cause. Iowa Const. art. I, § 8 (emphasis added). The federal counterpart to Iowa's right is found in the Fourth Amendment to the United States Constitution. U.S. Const. amend. IV ("The right of the people to be secure . . . against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause . . . ."). The text of both provisions applies its protection to all people, including people who may be detached totally from any suspicion of criminal behavior, although the right is most often applied in the law to people suspected of engaging in criminal behavior.[1] *See United States*

---

[1]The assertion of and claims regarding the right primarily arise in the criminal context due to the sole means of remedy: the suppression of evidence in a prosecution against an accused that was obtained in or because of an unconstitutional search or seizure of the accused, their home, or things. *Linkletter v. Walker*, 381 U.S. 618, 634, 85 S. Ct. 1731, 1740, 14 L. Ed. 2d 601, 611 (1965) ("We also affirmatively found that the exclusionary rule was . . . the only effective remedy for the protection of rights under the Fourth Amendment . . . ."), *abrogated on other grounds by Griffith v. Kentucky*, 479 U.S. 314, 320–22, 107 S. Ct. 708, 712–13, 93 L. Ed. 2d 649, 656–57 (1987); *Wong Sun v. United States*, 371 U.S. 471, 487–88, 83 S. Ct. 407, 417, 9 L. Ed. 2d 441, 455 (1963) (holding evidence obtained at the exploitation of an illegal search and seizure cannot be used against the person searched); *see also State v. Cline*,

*v. Verdugo-Urquidez,* 494 U.S. 259, 265–66, 110 S. Ct. 1056, 1060–61, 108 L. Ed. 2d 222, 232–33 (1990) (examining the meaning of "the people" in the context of Fourth Amendment protections); *Katz v. United States*, 389 U.S. 347, 351, 88 S. Ct. 507, 511, 19 L. Ed. 2d 576, 582 (1967) ("[T]he Fourth Amendment protects people, not places."). Overall, the right protects people against warrantless searches, with carefully crafted exceptions.

The declaration of the right in the context of its ownership by the people projects a powerful statement. It identifies the importance of the right to our founders and the prominence of the right in society. *See Boyd v. United States,* 116 U.S. 616, 624–35, 6 S. Ct. 524, 529–35, 29 L. Ed. 746, 749–52 (1886) (describing in detail the development of the right and its importance to the founders), *abrogated on other grounds by Warden v. Hayden,* 387 U.S. 294, 301–02, 87 S. Ct. 1642, 1647, 18 L. Ed. 2d 782, 788–89 (1967). Yet, the thrust of the right does not speak in absolutes, but reason. *See State v. Naujoks*, 637 N.W.2d 101, 107 (Iowa 2001) ("The essential purpose of the Fourth Amendment 'is to impose a standard of "reasonableness" upon the exercise of discretion by government officials . . . .' " (quoting *State v. Loyd*, 530 N.W.2d 708, 711 (Iowa 1995))). This approach permits the reasonableness of searches to adapt over time to new challenges given to the people and government that were not contemplated at the time the provision was framed. It allows the right to take on a new shape over time in response to new understandings of those times when government is permitted to conduct

---

617 N.W.2d 277, 291 (Iowa 2000) ("There is simply no meaningful remedy available to one who has suffered an illegal search other than prohibiting the State from benefiting from its constitutional violation."), *overruled on other grounds by State v. Turner*, 630 N.W.2d 601, 606 n.2 (Iowa 2001).

a reasonable search, including the search of people or places for purposes primarily unrelated to the enforcement of criminal laws. *See, e.g., New Jersey v. T.L.O.*, 469 U.S. 325, 335–36, 105 S. Ct. 733, 739–40, 83 L. Ed. 2d 720, 730–31 (1985) (examining the reasonableness of warrantless school searches). These future circumstances can both expand the types of warrantless searches permitted by the right, just as it could diminish the number or type of exceptions over time. *See State v. Cline,* 617 N.W.2d 277, 283 (Iowa 2000) (declining to adopt a good-faith exception to the exclusionary rule under the Iowa Constitution), *overruled on other grounds by State v. Turner,* 630 N.W.2d 601, 606 n.2 (Iowa 2001). Over approximately the last fifty years, new needs of the government to conduct warrantless searches primarily unrelated to law enforcement have challenged the shape of the right through what has become known as the special-needs doctrine. *See T.L.O.*, 469 U.S. at 332–33 & n.2, 340–41, 105 S. Ct. at 737–38 & n.2, 742, 83 L. Ed. 2d at 728–29 & n.2, 734.

**A. Special-Needs Doctrine.** The special-needs doctrine first surfaced under our federal jurisprudence in *Camara v. Municipal Court,* 387 U.S. 523, 87 S. Ct. 1727, 18 L. Ed. 2d 930 (1967). In *Camara,* the Court articulated a test to determine if and for what reason a warrant would be needed for an administrative search. *Id.* at 532–33, 539–40, 87 S. Ct. at 1732–33, 1736, 18 L. Ed. 2d at 937–38, 941 (finding a warrant was only necessary when entry of inspectors was refused in order to inform the homeowner of the limits of the search, that the inspector was authorized, and the necessity of the search to enforce the municipal code). *Camara* was followed by *T.L.O.*, 469 U.S. at 340–42 & n.7, 105 S. Ct. at 742–43 & n.7, 83 L. Ed. 2d at 733–35 & n.7, in which the Court applied a special-needs test to determine if public school officials needed

a warrant to conduct searches of school lockers. The doctrine derived its name from the concurring opinion of Justice Blackmun, who stated: "Only in those exceptional circumstances in which special needs, beyond the normal need for law enforcement, make the warrant and probable-cause requirement impracticable, is a court entitled to substitute its balancing of interests for that of the Framers." *Id.* at 351, 105 S. Ct. at 748, 83 L. Ed. 2d at 741 (Blackmun, J., concurring in judgment).

In *Griffin v. Wisconsin*, 483 U.S. 868, 107 S. Ct. 3164, 97 L. Ed. 2d 709 (1987), the Court considered the special-needs doctrine in the context of a probationary search. In doing so, the basic application of the doctrine surfaced for the first time. *See Griffin*, 483 U.S. at 873, 107 S. Ct. at 3168, 97 L. Ed. 2d at 717. The Court acknowledged that "[a] probationer's home, like anyone else's, is protected by the Fourth Amendment's requirement that searches be 'reasonable.'" *Id.* On the other hand, it recognized that "a State's operation of a probation system . . . presents 'special needs' beyond normal law enforcement that may justify departures from the usual warrant and probable-cause requirements." *Id.* at 873–74, 107 S. Ct. at 3168, 97 L. Ed. 2d at 717. The conditions placed on the liberty of probationers "are meant to assure that the probation serves as a period of genuine rehabilitation and that the community is not harmed by the probationer's being at large," which requires and justifies the exercise of supervision to ensure the conditions of probation are followed. *Id.* at 875, 107 S. Ct. at 3169, 97 L. Ed. 2d at 718. The Court ultimately held that requiring a warrant would remove supervisory power from the probation officer and place it in the warrant judge, interfere with quick responses to violations, and reduce the deterrent effect that the searches would create. *Id.* at 876, 107 S. Ct. at 3170, 97 L. Ed. 2d at 719. Even the dissent found probation supervision

fell within a special-needs category to justify the examination of the reasonableness of probation-related searches and ultimately concluded the threshold probable-cause requirement for a warrant should be lowered because supervision advances rehabilitation "by allowing a probation agent to intervene at the first sign of trouble." *Id.* at 881–83, 107 S. Ct. at 3172–73, 97 L. Ed. 2d at 722–24 (Blackmun, J., dissenting). Justice Blackmun observed that the probation officer monitors compliance with the conditions placed on the probationer's liberty and that a search of the home for violations may be necessary to ensure that compliance. *Id.* at 883, 107 S. Ct. at 3173, 97 L. Ed. 2d at 723. He concluded the special-needs doctrine should not apply in Griffin's case because the search of his home was not a normal probation search, but involved a tip from police to uncover evidence of a new criminal violation; therefore, Griffin's status as a probationer should not justify the special exception. *Id.* at 885, 107 S. Ct. at 3174, 97 L. Ed. 2d at 725.

In 1989, the Court extended the special-needs doctrine to cover drug testing by railroads pursuant to federal regulations in *Skinner v. Railway Labor Executives' Ass'n*, 489 U.S. 602, 109 S. Ct. 1402, 103 L. Ed. 2d 639 (1989). These tests were permitted when specific rules were violated or a supervisor had a reasonable suspicion based on specific observations that the employee was under the influence of alcohol.[2] *Id.* at 611, 109 S. Ct. at 1410, 103 L. Ed. 2d at 655–56 (citing 49 C.F.R. § 219.301(b) (1987)). The Court held the government had an

---

[2]Though performed by the railroad companies, there were sufficient "indices of the Government's encouragement, endorsement, and participation" to implicate the Fourth Amendment. *Skinner*, 489 U.S. at 615–16, 109 S. Ct. at 1412, 103 L. Ed. 2d at 658–59.

interest in regulating railroad employee conduct to ensure safety for both the traveling public and the employees, and this interest presented a special need beyond normal law enforcement that might justify a departure from the warrant requirement. *Id.* at 620–21, 109 S. Ct. at 1415, 103 L. Ed. 2d at 661–62. The Court found the standardized nature of the tests, the minimal discretion of administering them, and the practical difficulties of railroad supervisors obtaining a warrant from a magistrate while evidence dissipates all weighed against the necessity of requiring a warrant. *Id.* at 622–24, 109 S. Ct. at 1416–17, 103 L. Ed. 2d at 663–64. The Court noted that although other cases indicated a warrantless search must be based on probable cause or at least " 'some quantum of individualized suspicion,' " if the privacy interests are minimal then the search might be reasonable even absent such suspicion. *Id.* at 624, 109 S. Ct. at 1417, 103 L. Ed. 2d at 664 (quoting *United States v. Martinez-Fuerte*, 428 U.S. 543, 560, 96 S. Ct. 3074, 3084, 49 L. Ed. 2d 1116, 1130 (1976)). The reasonable expectations of privacy of employees were found to be diminished because the employees worked in an industry that was highly regulated to ensure the safety of everyone. *Id.* at 627, 109 S. Ct. at 1418, 103 L. Ed. 2d at 666.[3]

---

[3]The railroad industry's experience . . . persuasively shows, and common sense confirms, that the customary dismissal sanction that threatens employees who use drugs or alcohol while on duty cannot serve as an effective deterrent unless violators know that they are likely to be discovered. By ensuring that employees . . . know they will be tested upon the occurrence of a triggering event, the timing of which no employee can predict with certainty, the regulations significantly increase the deterrent effect of the administrative penalties associated with the prohibited conduct.

*Skinner*, 489 U.S. at 629–30, 109 S. Ct. at 1420, 103 L. Ed. 2d at 668.

Safety was again the paramount concern of the Court in *National Treasury Employees Union v. Von Raab*, 489 U.S. 656, 109 S. Ct. 1384, 103 L. Ed. 2d 685 (1989). The search in *Von Raab* involved testing by the Customs Service for drug use among three groups of employees: those directly involved in drug interdiction, those carrying firearms, and those handling classified material. *Id.* at 660–61, 109 S. Ct. at 1388, 103 L. Ed. 2d at 699. The program was designed for deterrence and could not be used in criminal prosecution without consent from the tested employee, setting it outside the needs of normal law enforcement and within the special-needs test. *Id.* at 666, 109 S. Ct. at 1391, 103 L. Ed. 2d at 702. The Court found the imposition of the warrant requirement would bring normal or routine employment decisions to a constitutional magnitude and could compromise the mission of the Customs Service if warrants were needed without providing any additional protection to personal privacy of the employees.[4] *Id.* at 666–67, 109 S. Ct. at 1391, 103 L. Ed. 2d at 702–03. Further, the Court found the government's need to conduct the searches outweighed the privacy interests of those who carried firearms and engaged in drug interdiction, but the need did not clearly outweigh the privacy interests of those handling classified information. *Id.* at 668, 678, 109 S. Ct. at

---

[4]A warrant serves primarily to advise the citizen that an intrusion is authorized by law and limited in its permissible scope and to interpose a neutral magistrate between the citizen and the law enforcement officer "engaged in the often competitive enterprise of ferreting out crime." But in the present context, "the circumstances justifying toxicological testing and the permissible limits of such intrusions are defined narrowly and specifically . . . and doubtless are well known to covered employees."

*Von Raab*, 489 U.S. at 667, 109 S. Ct. at 1391, 103 L. Ed. 2d at 703 (citation omitted) (quoting *Johnson v. United States*, 333 U.S. 10, 14, 68 S. Ct. 367, 369, 92 L. Ed. 436, 440 (1948) (first quote); *Skinner*, 489 U.S. at 622, 109 S. Ct. at 1416, 103 L. Ed. 2d at 663) (second quote)).

1392, 1397, 103 L. Ed. 2d at 704, 710.  The Court reasoned that drug use by agents whose job was to prevent drugs from entering the country might create a conflict of interest that would interfere with the successful execution of their duties and that those customarily using firearms could not risk impaired perception or judgment caused by drug use.  *Id.* at 670–71, 109 S. Ct. at 1393, 103 L. Ed. 2d at 705.  However, the Court found no evidence whether those with access to "classified" information actually had access to sensitive information that might merit the mandatory testing and could not find the overly broad category reasonable.  *Id.* at 678, 109 S. Ct. at 1397, 103 L. Ed. 2d at 710.  The dissent acknowledged that "whether a particular search has been 'reasonable' . . . depends largely upon the social necessity that prompts the search."  *Id.* at 681–82, 109 S. Ct. at 1399, 103 L. Ed. 2d at 712–13 (Scalia, J., dissenting).  However, it did not find sufficient social necessity to require drug testing of Customs Service employees handling classified material without evidence of a real drug use problem among them.  *Id.*

The analysis the Court used in *Vernonia School District 47J v. Acton*, 515 U.S. 646, 115 S. Ct. 2386, 132 L. Ed. 2d 564 (1995), to examine drug testing of students is very useful.  First, the Court considered the nature of the privacy interest intruded upon by the search and the legitimacy of the privacy expectation.  *Id.* at 654, 115 S. Ct. at 2391, 132 L. Ed. 2d at 575.  The second factor considered was the complained-of character of the intrusion.  *Id.* at 658, 115 S. Ct. at 2393, 132 L. Ed. 2d at 577 (recognizing urinalysis intrudes on a traditionally shielded private function).  Finally, the court analyzed "the nature and immediacy of the governmental concern at issue here, and the efficacy of this means for meeting it."  *Id.* at 660, 115 S. Ct. at 2394, 132 L. Ed. 2d at 579.  Rather than a minimum level of interest, the Court found the

governmental interest needed to be important enough to outweigh the privacy interest and the extent of the intrusion. *Id.* at 661, 115 S. Ct. at 2394–95, 132 L. Ed. 2d at 579. The Court found the drug problem among students in the community was severe enough to permit random warrantless, suspicionless urinalysis of students who participated in sports. *Id.* at 664–65, 115 S. Ct. at 2396, 132 L. Ed. 2d at 582. Justice O'Connor dissented, suggesting that suspicion-based searches were not impracticable in the particular context, rendering the blanket suspicionless search unreasonable. *Id.* at 671, 679–81, 115 S. Ct. at 2399, 2403–04, 132 L. Ed. 2d at 586, 591–92 (O'Connor, J., dissenting) ("Protection of privacy, not evenhandedness, was then and is now the touchstone of the Fourth Amendment.").

In *Chandler v. Miller*, 520 U.S. 305, 117 S. Ct. 1295, 137 L. Ed. 2d 513 (1997), the Supreme Court placed boundaries on the special-needs exception as to warrantless, suspicionless searches. The State of Georgia wanted to mandate drug testing for political candidates similar to the requirements for railroad employees in *Skinner* and border patrol agents in *Von Raab*. *Chandler*, 520 U.S. at 308–09, 117 S. Ct. at 1298, 137 L. Ed. 2d at 519–20. However, the Court found "[o]ur precedents establish that the proffered special need . . . must be substantial— important enough to override the individual's acknowledged privacy interest, sufficiently vital to suppress the Fourth Amendment's normal requirement of individualized suspicion." *Id.* at 318, 117 S. Ct. at 1303, 137 L. Ed. 2d at 526. In order to find a special need, there must be an indication of concrete dangers, not merely hypothetical ones, that justify departing from the basic prescriptions of the Fourth Amendment. *Id.* at 318–19, 117 S. Ct. at 1303, 137 L. Ed. 2d at 526. "[W]here the risk to public safety is substantial and real, . . . searches calibrated to the risk

may rank as 'reasonable.' " *Id.* at 323, 117 S. Ct. at 1305, 137 L. Ed. 2d at 529.

Overall, the most pertinent federal precedent in the special-needs area for the present case is *Griffin.*[5] The *Griffin* Court held the special-needs exception applied to a search of a probationer's home by a probation officer, even when conducting the search for law enforcement purposes rather than probationary purposes. 483 U.S. at 874–75, 107 S. Ct. at 3169, 97 L. Ed. 2d at 717–18 (majority opinion). The other special-needs cases shape and modify how special-needs exceptions are evaluated and applied. While several of the opinions permit suspicionless searches, those are limited by the findings of minimal privacy rights that are invaded, *Skinner*, 489 U.S. at 624, 109 S. Ct. at 1417, 103 L. Ed. 2d at 664, and the requirement that the governmental need has to be important enough to override the privacy rights of the individual, *Chandler*, 530 U.S. at 318, 117 S. Ct. at 1303, 137 L. Ed. 2d at 526. Moreover, the only concerns that have made it through the Court's important-concern test are drugs in schools or relate to the safety of the public and individuals. *Acton*, 515 U.S. at 664–65, 115 S. Ct. at 2396, 132 L. Ed. 2d at 582 (majority opinion); *Von Raab*, 489 U.S. at 668, 109 S. Ct. at 1392, 103 L. Ed. 2d at 704 (majority opinion);

---

[5]Although *United States v. Knights*, 534 U.S. 112, 122 S. Ct. 587, 151 L. Ed. 2d 497 (2001), and *Samson v. California*, 547 U.S. 843, 126 S. Ct. 2193, 165 L. Ed. 2d 250 (2006), both considered the constitutionality of searches of probationer homes, both did so under a straight reasonableness analysis under the Fourth Amendment, not utilizing a special-needs analysis similar to that done in *Griffin. Knights*, 534 U.S. at 117–18, 122 S. Ct. at 590–91, 151 L. Ed. 2d at 504–05 (deciding that warrantless searches of probationers may be reasonable outside the special-needs context); *see also Samson*, 547 U.S. at 847, 126 S. Ct. 2196, 165 L. Ed. 2d at 256 (holding a condition of release "can so diminish or eliminate a released prisoner's reasonable expectation of privacy that a suspicionless search by a law enforcement officer would not offend the Fourth Amendment"). Thus, an examination of these cases would not apply to our special-needs analysis.

*Skinner*, 489 U.S. at 620–21, 109 S. Ct. at 1415, 103 L. Ed. 2d at 662; *see also Mich. Dep't of State Police v. Sitz*, 496 U.S. 444, 454–55, 110 S. Ct. 2481, 2487–88, 110 L. Ed. 2d 412, 423 (1990) (upholding a warrantless, suspicionless sobriety checkpoint using empirical data to support its need and efficacy).

In 2003, we applied the special-needs doctrine in a case involving the search of a school locker by school officials. *State v. Jones*, 666 N.W.2d 142–43 (Iowa 2003). In doing so, we borrowed from the federal jurisprudence and adopted the three-factor test to determine if the doctrine would support the warrantless search of the lockers. *Id.* at 146. Under the analysis, we considered (1) the nature of the privacy interest at stake, (2) the character of the intrusion, and (3) the nature and immediacy of the government concern at stake and the ability of the search to meet the concern. *Id.* We applied these factors to uphold a warrantless random search of school lockers. *Id.* at 150.

We have not applied the special-needs doctrine beyond the search of school lockers. We have evaluated the doctrine, however, in the context of the search of the home of a parolee by police officers who suspected the parolee had drugs inside the house. *See generally Kern*, 831 N.W.2d at 165–72. Yet, we did not assess the doctrine beyond the specific circumstances of the case. *See id.* at 170–72. These circumstances revealed police officers conducted the search for the primary purpose of gathering and using evidence for a criminal prosecution. *Id.* at 171. Thus, evaluating the case through the lens of our search and seizure clause, we did not see the doctrine as a means to enable law enforcement officers to carry out their duties in gathering evidence of criminal activity. *Id.* at 170. Moreover, the circumstances of the case did not demonstrate any reason that the warrant requirement of

the right against unreasonable search and seizure would have frustrated the purpose of the search. *Id.* at 172. Accordingly, we did not view the doctrine as a means to excuse requiring law enforcement officers to obtain a search warrant under the Iowa Constitution. *Id.*

Thirty-three years earlier, we addressed some of the underpinnings of the special-needs doctrine in the context of the search of an apartment of a parolee initiated by his parole officer, without making any specific reference to the doctrine. *State v. Cullison*, 173 N.W.2d 533 (Iowa 1970). In that case, we rejected the theories used to minimize the constitutional protections of parolees and held that parolees maintain the same safeguards afforded all people against warrantless searches involving evidence of new crimes. *Id.* at 538. The search conducted in *Cullison* began as a parole-related visit by a parole officer to determine the reason the parolee failed to show up for work. *Id.* at 534. After leaving and then returning to the apartment, the parole officer asked to search a locked room of the apartment to investigate for any other parole violations. *Id.* at 535. The parole officer "became suspicious" after the parolee objected to his request to have the locked door opened and after the parolee told him there was something in the room that he did not want him to see. *Id.* The parole officer knew at the time that there had been recent burglaries in the area, and he sought the assistance of a police officer to assist in entering and searching the room. *Id.* We held the search violated the Federal Search and Seizure Clause because it was not based on probable cause. *Id.* at 539–40. The special-needs doctrine was not fully developed at the time, and the facts of the case blurred any line between a search by a parole officer to carry out the parole mission and a search by law enforcement personnel for evidence of criminal activity. *See id.* Nevertheless, we expressed no constitutional criticism of the

search of the apartment by the parole officer until the officer became suspicious of the contents of the locked room and obtained the assistance of a police officer to pursue that suspicion. *Id.* at 538 (protecting the parolee's constitutional safeguards only "as to a new and separate crime").

In *State v. Ochoa*, 792 N.W.2d 260 (Iowa 2010), we held that a search by police of a motel room occupied by a parolee was unreasonable under the search and seizure clause of the Iowa Constitution when based solely on the parolee's status. *Ochoa*, 792 N.W.2d at 289–91. Notwithstanding, we acknowledged "[a] properly limited, nonarbitrary warrantless search of the home by a parole officer *might* conceivably be supported under the 'special needs' doctrine." *Id.* at 288.

In *State v. Short*, 851 N.W.2d 474 (Iowa 2014), we were confronted with "an investigatory search by law enforcement related to new crimes" at the home of a probationer. *Short*, 851 N.W.2d at 477. We held "the warrant requirement has full applicability to home searches of both probationers and parolees by law enforcement." *Id.* at 506. We declared a search by law enforcement without an adequate warrant violated the search and seizure clause of the Iowa Constitution, but acknowledged the search involved "was not a probationary search." *Id.* at 477, 505. We again reserved the question whether searches by probation or parole officers as a part of their ordinary duties would be permissible. *Id.* at 505. At the same time, we emphasized that the warrant requirement cannot be overcome by notions of reasonableness detached from the protections sought. *Id.* at 502.

**B. Application.** The facts at issue in this case bring us directly to that point in time when we now fully confront whether the special-needs doctrine of governmental concerns that justify a warrantless search

includes the search of the home of a parolee by a parole officer for the purpose of carrying out the mission of parole. We do this, not to overturn or alter our prior opinions concerning searches and seizures as related to parolees, but rather, to answer the question expressly left open by those decisions. *See id.* at 505 (reserving the question of a search by a parole officer as part of ordinary duties for another day); *Kern*, 831 N.W.2d at 170–71 (explaining any special-needs doctrine "would require that the search by a parole officer be designed to fit the special needs of parole" before concluding such a situation did not exist in that case); *State v. Baldon*, 829 N.W.2d 785, 789 (Iowa 2013) (noting no evidence was introduced about a need for the parole officer to search consistent with the general mission of parole); *Ochoa*, 792 N.W.2d at 288 (noting that "[a] properly limited, nonarbitrary warrantless search of the home by a parole officer *might* conceivably be supported under the 'special needs' doctrine"); *Cullison*, 173 N.W.2d at 544 (Stuart, J., dissenting) (arguing the majority did not answer the question of whether a parole-officer search as part of ordinary duties fits within a warrantless-search exception). We analyze the parole search issue by considering the three factors identified in *Jones*.

1. *Nature of the privacy interest.* The first factor considers the nature of the privacy intruded upon by the search. *Jones*, 666 N.W.2d at 146. In considering this factor, we start with the principle that parolees have the same expectation of privacy in their homes as persons not convicted of crimes and not on probation or parole. *Cullison*, 173 N.W.2d at 537–38 (majority opinion); *see also Ochoa*, 792 N.W.2d at 290–91. Yet, that equal footing recognized under our Iowa Constitution predominantly exists in the context of the search and seizure by law enforcement officers for evidence of crimes. *See Kern*, 831 N.W.2d at

164–65, 170–71. Unlike people not on parole from a sentence of incarceration resulting from a prior criminal conviction, parolees are under the supervision of the government pursuant to a written parole agreement. *See* Iowa Code § 906.1 (2013); Iowa Admin. Code r. 201—45.1(2). These agreements require the parolee to submit to searches and other governmental intrusions not permitted against people not on parole. Iowa Admin. Code r. 201—45.2 (describing standard conditions of parole and permitting additional special conditions to be imposed in the agreement). *See generally Baldon,* 829 N.W.2d at 789–802 (tracing the use and effect of consent-to-search clauses). If a term of the agreement is not followed, the parole can be revoked and the parolee returned to confinement to serve out the remainder of the sentence. Iowa Admin Code r. 201—45.4. Thus, the expectation of privacy in a home enjoyed by parolees can come at an expense not faced by people not on parole. In other words, parolees can share the full expectation of privacy afforded nonparolees only if the parolee chooses to violate the parole agreement by refusing to permit a reasonable search and risk paying the possible price of revocation of parole.

In *Cullison,* the parole agreement did not require the parolee to permit the parole officer to search the apartment, nor did it give the parolee notice that such a search might occur. 173 N.W.2d at 534 ("Teeters executed an instrument by which he agreed to conduct himself honestly, obey the law, keep reasonable hours, refrain from excessive use of intoxicants, and remain at all times in Montgomery County."). Thus, the parolee maintained the same expectation of privacy enjoyed by people not out on parole and required the state to justify the warrantless search on other grounds permitted under the constitution, not simply his status as a parolee. *See id.* at 537–38. Because no such grounds existed and

no other grounds supported the search, a warrant was necessary for the search to be constitutional. *Id.* at 540.

In this case, King did not choose to maintain his privacy interest by refusing access to his residence or the bedroom of his residence. Instead, he complied with the terms of parole by allowing the parole officers into his apartment and showing them to his bedroom to conduct the search. Of course, these acts of compliance did not establish an independent ground to search based on a waiver of his constitutional rights. *See Baldon*, 829 N.W.2d at 802–03. No such independent grounds existed. However, the acts of compliance did place the government and King on different footing than the government and the parolee in *Cullison*, in which the search was refused. *See* 173 N.W.2d at 535. The parole officers conducted, and King did not refuse, the search pursuant to the terms of the parole agreement. Further, unlike *Cullison*, the parole agreement served to diminish the expectation of privacy of the parolee in relation to his parole officer by placing him on notice that such a search might occur. Thus, we must decide if the interests of the government under these circumstances are strong enough to prevail over the legitimate privacy interests of a parolee who has failed to refuse or in any way signal a lack of consent to a search the parolee had notice could occur. This approach continues to protect the long-standing and historical protections tied to a home under article I, section 8 of the Iowa Constitution, but recognizes these protections can at times be altered by the provisions parolees must comply with under parole agreements to maintain their conditional freedom. Thus, a legitimate expectation of privacy exists, even if altered by the parole agreement as it relates to the parole officer, and our task is to determine whether the right has been violated by considering the competing interests at stake. *See State v.*

*Lowe*, 812 N.W.2d 554, 567–68 (Iowa 2012) (evaluating whether a legitimate expectation of privacy existed before addressing if there had been an unreasonable intrusion upon it). We therefore proceed to the second factor to consider the character of the intrusion posed by the policy behind the search. *Jones*, 666 N.W.2d at 148.

2. *Character of the intrusion.* The policy of a parolee search is embedded in the supervisory relationship between the parole officer and the parolee, as well as the historical purpose and goal of our system of parole. *See generally Morrissey v. Brewer*, 408 U.S. 471, 478–79, 92 S. Ct. 2593, 2598–99, 33 L. Ed. 2d 484, 492–93 (1972). A review of this history helps reveal the character of the intrusion in this case.

The theory of parole originated in Alexander Maconochie's system of supervising the British penal colony in Australia in the 1840s, where prisoners earned marks and progressed through gradations of servitude to earn their ticket-of-leave. 1 Neil P. Cohen, *The Law of Probation and Parole* § 1:11, at 1-17 to -18 (2d ed. 1999) [hereinafter Cohen]. In the 1850s, Ireland adapted the idea into their penal system under the leadership of Walter Crofton, who introduced the element of postrelease supervision. *Id.* § 1:11, at 1-18; Joan Petersilia, *Parole and Prisoner Reentry in the United States*, 26 Crime & Just. 479, 488 (1999) [hereinafter Petersilia]. The parole system made it to America in 1876 when adopted for the juvenile reformatory system in New York, with the addition of indeterminate sentencing.[6] 1 Cohen § 1:12, at 1-19; Petersilia, 26 Crime & Just. at 488. It spread quickly to other states, no

---

[6]The timing here is an important consideration in constitutional analysis. The Iowa Constitution was passed in 1857. The Fourth Amendment to the United States Constitution was ratified in 1791 and officially adopted in 1792. Even the concept of parole would have been foreign to the statesmen who debated and created the search and seizure protections we are striving to balance against the needs of society.

longer restricted to juveniles. 1 Cohen § 1:12, at 1-19. Today, most states and the federal government have statutes and regulations providing for parole and methods of supervision and enforcement that vary widely, making comparisons among and between jurisdictions of limited utility.[7] *See id.* § 1:21, at 1-30; Petersilia, 26 Crime & Just. at 494–96.

Iowa first provided "for a system of reform and parole" in 1907 with an act pertaining to "Indeterminate sentences and reformatory." 1907 Iowa Acts ch. 192 (codified at Iowa Code §§ 5718-a4 to –a26 (1907 Supp.)). The Act converted one of the state penitentiaries into a reformatory. Iowa Code § 5718-a4. The reformatory was available for all female convicts and first-time male convicts between ages sixteen and thirty who were not convicted of specified heinous crimes. *Id.* §§ 5718-a5, -a27. The Act also established indeterminate sentences for the first time for all crimes except murder and treason. *Id.* § 5718-a13. The board of parole was also established and delegated the "power to establish rules and regulations" for releasing persons to parole. *Id.* §§ 5718-a14, -a18. It allowed

> prisoners . . . to go upon parole outside of the penitentiary buildings, . . . but to remain while on parole in the legal custody of the wardens . . . and under the control of the said board of parole and subject, at any time, to be taken back and confined within the penitentiary.

---

[7]In the first case to reach the U.S. Supreme Court involving a parole question—in the form of a separation-of-powers challenge—the Court deferred to a decision by the state supreme court permitting delegation of judicial powers in the legislative creation of indeterminate sentencing as permissible under the state constitution, further stating that it did not present a question under the Federal Constitution. *Dreyer v. Illinois*, 187 U.S. 71, 83–84, 23 S. Ct. 28, 32, 47 L. Ed. 79, 85 (1902) (examining an Illinois parole statute passed in 1899).

*Id.* § 5718-a18. The board was further empowered to determine when the parolee had sufficiently become a law-abiding citizen and when he or she could be released from parole. *Id.* § 5718-a20.

Early on, Iowa courts treated parole as "a conditional pardon." *Kirkpatrick v. Hollowell,* 197 Iowa 927, 931, 196 N.W. 91, 92 (1923). Parole was considered "a conditional and experimental release before expiration of sentence." *Addis v. Applegate,* 171 Iowa 150, 173, 154 N.W. 168, 176 (1915) (Salinger, J., concurring). In 1923, the extraordinary session of the Iowa legislature amended the Code sections on charitable, correctional, and penal institutions. 1923 Iowa Acts Extraordinary Sess. (unpublished) ch. 55, §§ 481 to 506-a1 (Iowa 1924) (codified at Iowa Code §§ 3782–3811 (1924)). Among other provisions, probation as we now know it was created, but under the name "court parole" (as opposed to the "board parole" dealing with the release of those already in prison). *See* Iowa Code §§ 3786, 3788, 3800 (providing for "parole before commitment" by the board of those not previously convicted of a felony and for the court to suspend sentence and parole). It is this probation or court parole—also called "bench parole"—that the Iowa courts referred to as "a matter of grace, favor, and forgiveness." *Pagano v. Bechly,* 211 Iowa 1294, 1298, 232 N.W. 798, 799–800 (1930) (comparing suspended sentence and parole to a pardon, within the conditions and limitations provided by statute); *see also Cole v. Holliday,* 171 N.W.2d 603, 605 (Iowa 1969); *State v. Boston,* 234 Iowa 1047, 1051, 14 N.W.2d 676, 679 (1944).

In 1972, the United States Supreme Court had occasion to examine the Iowa system of parole in *Morrissey,* in a challenge to Iowa's method of parole revocation. Part of the examination included a description of parole officers and their role:

The parole officers are part of the administrative system designed to assist parolees and to offer them guidance. The conditions of parole serve a dual purpose; they prohibit, either absolutely or conditionally, behavior that is deemed dangerous to the restoration of the individual into normal society. And through the requirement of reporting to the parole officer and seeking guidance and permission before doing many things, the officer is provided with information about the parole and an opportunity to advise him. The combination puts the parole officer into the position in which he can try to guide the parolee into constructive development.

*Morrissey*, 408 U.S. at 478, 92 S. Ct. at 2599, 33 L. Ed. 2d at 492–93. Just a few months later, we observed the similarities between probation and parole—that although probation and parole take place at opposite ends of a prison sentence, with probation resulting from judicial action before prison and parole resulting from administrative action following prison, "both follow conviction and imposition of sentence." *State v. Wright*, 202 N.W.2d 72, 76 (Iowa 1972).

The Iowa legislature revised the criminal code in 1976, effective January 1, 1978. 1976 Iowa Acts ch. 1245 (codified in scattered sections of Iowa Code (1979)); *id.* ch. 1245, ch. 4, § 529. One provision replaced the legal custody of parolees with departmental supervision of parolees. Prior to the revision, Iowa Code section 247.9 provided that "[a]ll paroled prisoners shall remain, while on parole, in the legal custody of the warden or superintendent and under the control of the chief parole officer." Iowa Code § 247.9 (1977). The new statute provided that "[e]very person while on parole shall be under the supervision of the department of social services, which shall prescribe regulations for governing persons on parole." Iowa Code § 906.5 (1979).

In 1983, the Iowa Department of Social Services was reorganized, establishing the Iowa Department of Corrections. Iowa Code ch. 217A (1985)). At that time, the parole functions were transferred to the newly

created department of corrections. *Id.* § 906.1. Today, parole officers are still part of the department of corrections, working out of the local judicial district department of correctional services. Iowa Code § 906.2 (2013).[8]

When granting parole, the board of parole does not grant an inmate "the absolute liberty to which every citizen is entitled, but only . . . the conditional liberty properly dependent on observance of special parole restrictions." *Morrissey*, 408 U.S. at 480, 92 S. Ct. at 2600, 33 L. Ed. 2d at 494. "Conditional" liberty means that in order to remain in the community instead of being re-incarcerated, the parolee must comply with both standard conditions of parole required of all parolees, and special conditions imposed depending on the needs of that particular case. Iowa Admin. Code r. 201—45.2(1) (listing standard conditions); *id.* r. 201—45.2(2) (providing for the imposition of parolee-specific special conditions). A parole officer has the obligation to monitor the compliance with those conditions of each of the persons under supervision. *See id.* r. 201—45.4, .6 (requiring parole officer recommend when to revoke, continue, or discharge parole). Today, our legislature has statutorily defined parole as

> the release of a person who has been committed to the custody of the director of the Iowa department of corrections by reason of the person's commission of a public offense, which release occurs prior to the expiration of the person's term, is subject to supervision by the district department of

---

[8]The board of parole is independent from the department of corrections, with members appointed by the Governor and confirmed by the senate. Iowa Code § 904A.3. However, the majority of members of the board are expected to be "knowledgeable in correctional procedures and issues." *Id.* § 904A.2. The board has a duty to create and review any parole programs and procedures. *Id.* § 904A.4(3); *id.* § 906.3. However, the board of corrections has rulemaking power over the administration of the parole system. *Id.* § 904.105(6)–(7); *id.* § 906.5(4).

correctional services, and is on conditions imposed by the district department.

Iowa Code § 906.1.

The supervision component of parole necessarily involves intrusion by government into the lives of parolees as they assimilate back into society. *See Griffin*, 483 U.S. at 874–75, 107 S. Ct. at 3169, 97 L. Ed. 2d at 718. But, the intrusions based on the policy of the purpose of parole, rehabilitation of the parolees and maintaining public safety, are unrelated to the purpose of gathering evidence of criminal behavior that has already occurred for the purpose of enforcing laws through a criminal prosecution. *See Kern*, 831 N.W.2d at 170–72; *Ochoa*, 792 N.W.2d at 286. The parole officer needs to be able to evaluate the parolee's compliance with all the conditions of the parole agreement to determine if any assistance is needed, to evaluate if the parolee is ready for discharge, or to revoke parole if necessary. Iowa Code §§ 906.2, .15; Iowa Admin. Code r. 201—45.4. While criminal prosecutions can result from parolee conduct subject to conditions of parole that is also criminal conduct, the intrusions are often considered a necessary part of the supervision and an essential ingredient to the success of parole. 1 Cohen, § 17:7, at 17-11 to -12. Without reasonable intrusions, the goal and purpose of parole would be difficult, if not impossible, to accomplish. *See id.* §§ 17:16–:17, at 17-27 to -29 (discussing the exclusionary rule and the necessity of searches in relation to parole revocation).

The character of the particular intrusion at issue in this case, of course, is the search of the residence of a parolee by a parole officer. Yet, the intrusion in this case was much different than we confronted in *Cullison*. *See* 173 N.W.2d at 534–35. In *Cullison*, the parolee not only refused to permit his parole officer to search the locked room, but the

warrantless search that followed was conducted with the aid of a law enforcement officer and pursued with a suspicion that the room might contain evidence of a new and independent crime. *Id.* at 535. The initial intrusion by the parole officer in the apartment, however, was consistent with the mission of parole and was not part of the analysis that found the search of the home to be unconstitutional. *See id.* at 538. Instead, the intrusion only ran afoul of the Iowa Constitution when the search became intertwined with the state's interest in law enforcement after the parolee placed limits on the search area. *See id.* at 539–40. Thus, *Cullison* did not address the constitutionality of all parole searches, and its holding does not preclude all parole searches. *See id.* at 544 (Stuart, J., dissenting). Rather, we confined our analysis in *Cullison* to nonconsensual warrantless parole searches of "the parolee's living quarters in connection with the prosecution of a new and independent criminal action." *Id.* at 535 (majority opinion). The question we answered was "what constitutional rights, if any, an individual surrenders upon conditional release from one of our state penal institutions." *Id.* We did not address how the answer to that question would affect a parole search, pursuant to a parole agreement, that was divorced from the objectives of law enforcement and confined to the special needs of parole officers in supervising parolees. *See id.* at 537–38.

A distinction exists between searches to pursue the purposes of law enforcement and those to pursue the purposes of carrying out the mission of parole. *See Kern*, 831 N.W.2d at 170. The special needs of parole are divorced from the general interests of the state in law enforcement. *See Ferguson v. City of Charleston*, 532 U.S. 67, 79–80, 121 S. Ct. 1281, 1289–90, 149 L. Ed. 2d 205, 217 (2001) (requiring the

nature of the special need be "divorced from the State's general interest in law enforcement"). Thus, the special role of parole officers in carrying out the objectives and policy of parole becomes critical to the analysis. *See Samson v. California*, 547 U.S. 843, 858–59, 126 S. Ct. 2193, 2203, 165 L. Ed. 2d 250, 263–64 (2006) (Stevens, J., dissenting). As identified in *Griffin*, the special role of parole and probation is derived from the "ongoing supervisory relationship—and one that is not, or at least not entirely, adversarial—between the object of the search and the decisionmaker" not present in other searches. 483 U.S. at 879, 107 S. Ct. at 3171, 97 L. Ed. 2d at 721. Indeed, not all objects of a parole search are subject to criminal investigation outside of parole, including conditions limiting alcohol consumption and persons with whom the parolee may associate. Yet, for the special-needs analysis to apply, the reasons for the search must be the interest in supervising the reintegration of parolees into society, "not, or at least not principally, the general law enforcement goal of detecting crime." *Samson*, 547 U.S. at 859, 126 S. Ct. at 2203, 165 L. Ed. 2d at 264.

At the same time, an intrusion permissible under article I, section 8 must be narrowly defined. The purpose of search and seizure clauses "is to safeguard the privacy and security of individuals against arbitrary invasions by governmental officials," *Camara*, 387 U.S. at 528, 87 S. Ct. at 1730, 18 L. Ed. 2d at 935; and the traditional exceptions to the warrant requirement are "specifically established and well-delineated," *Katz*, 389 U.S. at 357, 88 S. Ct. at 514, 19 L. Ed. 2d at 585, to maintain safeguards when a warrant is impractical. *See Ochoa*, 792 N.W.2d at 278–79. Thus, an exception permitting special-needs parole searches must contain measures to protect against unfettered discretion by the state. *Samson*, 547 U.S. at 860, 126 S. Ct. at 2204, 165 L. Ed. 2d at

264. For parole searches to meet this requirement, the intrusion must serve at every point the mission and policy of parole as it applies to that particular parolee, not general law enforcement.

The character of the intrusion is also shaped by the scope of the search. The scope is limited to only those actions reasonable to ensure the parolee's compliance with the parole conditions with the goal of rehabilitation. If the scope of the parole search becomes too broad, it can take on the form of a search that serves the goals beyond the mission of parole. *See Kern*, 831 N.W.2d at 170 (describing when police presence shifts the purpose of the search beyond parole goals). Additionally, intrusions into certain areas within the house or containers within the home can heighten the privacy interest at stake. *See United States v. Ross*, 456 U.S. 798, 822–23, 102 S. Ct. 2157, 2172, 72 L. Ed. 2d 572, 592 (1982) ("[T]he Fourth Amendment provides protection to the owner of every container that conceals its contents from plain view. But the protection afforded by the Amendment varies in different settings." (Citation omitted.)). Therefore, the parole officer must limit the scope of the search to only those areas necessary to ensure compliance with the specific parole conditions the parole officer has a reasonable suspicion have been violated and only to the extent a reasonable person would find appropriate under the facts supporting that suspicion.

"[R]easonable suspicion is based on an objective standard: whether the facts available to the officer at the time of the stop would lead a reasonable person to believe that the action taken by the officer was appropriate." *State v. Kinkead*, 570 N.W.2d 97, 100 (Iowa 1997). This determination is made "in light of the totality of the circumstances confronting the officer," including specific, articulable facts and the rational inferences drawn from them. *State v. Tague*, 676 N.W.2d 197,

204 (Iowa 2004). The standard is more than a hunch or unparticularized suspicion, but less demanding than showing probable cause. *State v. Walshire,* 634 N.W.2d 625, 626 (Iowa 2001); *Kinkead,* 570 N.W.2d at 100. We have upheld the reasonable-suspicion standard in vehicular stop contexts for investigatory purposes, while requiring probable cause to effect a seizure. *State v. Tyler,* 830 N.W.2d 288, 293, 298 (Iowa 2013). "[R]easonable cause may exist to investigate conduct which is subject to a legitimate explanation and turns out to be wholly lawful." *State v. Richardson,* 501 N.W.2d 495, 497 (Iowa 1993).

In this case, the search extended into the bedroom of the parolee and included the search of a sunglasses case located on the headboard of the bed. Thus, the search extended beyond a visual inspection for drugs in plain view and into a more personal space of the parolee beyond the area of the initial encounter. *See generally State v. Oliver,* 341 N.W.2d 744, 745–47 (Iowa 1983) (explaining the requirements to establish a plain view exception to search and seizure law). This intrusion made the search more invasive, but not necessarily detached from the policy behind the search. The concerns that prompt the parole search in general need to be broad enough to achieve the purpose of parole, but narrow enough that the search not be arbitrary or depart from the parole mission. A parolee knows his home is subject to search under the parole agreement, and the policy prompting the need to search could be jeopardized if the search area is too constrained. Furthermore, King lived alone. The search did not intrude upon the privacy interests of other persons.

As to the search of the sunglasses case, it is commonly documented and understood that drugs and their paraphernalia are often hidden in small, everyday containers. *See State v. Finch,* No. 02–

1148, 2003 WL 22828750, at *2 (Iowa Ct. App. Nov. 26, 2003) (Altoid tin); *see also State v. Lowe*, 812 N.W.2d 554, 564, (Iowa 2012) (fruit can); *State v. Maxwell*, 743 N.W.2d 185, 189 (Iowa 2008) (cigarette pack); *State v. Eubanks*, 355 N.W.2d 57, 58 (Iowa 1984) (makeup case); *State v. Meksavanh*, No. 12–1878, 2014 WL 3749356, at *2 (Iowa Ct. App. July 30, 2014) (lamp shade, dresser drawer, purse, floor of backseat of car); *State v. Simmons*, No. 12–0567, 2013 WL 1750986, at *1 (Iowa Ct. App. Apr. 24, 2013) (cover of a speaker); *State v. Hoosman*, No. 09–0067, 2010 WL 1579428, at *2 (Iowa Ct. App. Apr. 21, 2010) (fake can of soda, CD case, ball of lint in laundry room); *State v. Palmer*, No. 03–1824, 2006 WL 126439, at *1 (Iowa Ct. App. Jan. 19, 2006) (flashlight). We have established a principle that there must be a nexus between the place searched and the object of the search. *State v. Hoskins*, 711 N.W.2d 720, 728 (Iowa 2006). This nexus includes "the nature of the items involved, the extent of the defendant's opportunity for concealment, and the normal inferences as to where the defendant would be likely to conceal the items." *State v. Groff*, 323 N.W.2d 204, 212 (Iowa 1982). Thus, Scarmon's search for evidence of drug-addiction relapse needed to be limited to those containers and areas that normal inferences, based on his past experience and knowledge of King, would lead him to believe King would conceal drugs or paraphernalia. A sunglasses case fits within the parameters to conceal methamphetamine and its paraphernalia, the suspected relapse drug. Additionally, the container was in plain view within the bedroom. More private areas within the bedroom were not entered.

The policy behind parole searches cannot be achieved if the search is so constrained that it would exclude the ability to search those common areas where the object of the search would be most commonly

found. This approach is consistent with the nexus requirement applicable to all searches and serves to both constrain the scope of the search and make the search broad enough to serve its goal. *See Hoskins,* 711 N.W.2d at 728 (permitting logical inferences in nexus consideration).

Overall, the character of the intrusion is modified when the parolee does not refuse the search.[9] It is also modified when the discretion to search is narrowed by the mission of parole and divorced from the general law enforcement objectives. The search also takes on a less intrusive character when it is confined to areas directly related to the concern that supported the decision to search. The policy of a parole search is separate from policies that promote the discovery of evidence to use in a new and independent prosecution. Accordingly, we proceed to consider the nature and immediacy of the concerns of the parole officer that led to the search of King's apartment.

3. *Nature of governmental concerns and efficacy of search policy.* The general governmental concern at stake in this case involves compliance by parolees with the conditions of their parole to prevent recidivism. The policies of rehabilitating parolees and maintaining public safety are both enforced through the mechanism of the supervision of the parolee and the conditions imposed for the duration of parole. The board of parole is instructed to release those persons who can be released "without detriment to the community or to the person." Iowa Code § 906.4(1). The parole officer is then tasked with the responsibility to "keep informed of each person's conduct and condition" to encourage

---

[9]Because the issue was not raised here, we do not determine the effect a refusal by the parolee would have had on the search.

rehabilitation and ensure public safety. *Id.* § 906.2; *see also* 1 Cohen § 17:7, at 17-10 to -11 ("The . . . parole officer has the primary responsibility for supervision of a parolee's . . . rehabilitative progress. This caseworker . . . owes a responsibility to the public to ensure that [those] who pose a threat to public safety are not permitted to remain free . . . ."). Ultimately, the parole officer's concern is the prevention of future crime through rehabilitation and close supervision until that rehabilitation is achieved. *See* 1 Cohen § 1:20, at 1-29, § 17:1, at 17-2. The legislature expressly directed parole officers to "use all suitable methods to aid and encourage the person to bring about improvement in the person's conduct or condition." Iowa Code § 906.2.

The specific nature of the concerns of government that gave rise to the search in this case related to a reasonable suspicion of drug use and loss of interest in completing parole by the parolee. These concerns surfaced from information obtained by the parole officer in his supervisory role. No law enforcement officers or law enforcement information was involved. The concerns related to the purposes and objectives of King's parole, not the enforcement of criminal laws. Even though the parole officer suspected parole violations that included unlawful activity, the concern that motivated the search was not formulated or acted upon by the parole officer for the primary purpose of enforcing the law.

The absence of an adversarial relationship between the parolee and the parole officer in this case is important in identifying the concerns of government. Only the parole officer, through the ongoing relationship with the parolee, possesses the knowledge of both the conditions imposed on a particular parolee and the conduct signaling a violation that rises to the level of a reasonable suspicion of parole violation that

needs to be pursued by the parole officer. If such conduct has risen to a level that involves law enforcement officials who approach the parole officer with suspicions of new criminal wrongdoing they want to pursue, the matter has moved beyond the scope of the government's concern of parole compliance and into the realm of law enforcement. This factor distinguishes this case from our prior parolee search cases that involved, in varying degrees, law enforcement officers and law enforcement purposes. *See Kern*, 831 N.W.2d at 157 (involving law enforcement officers searching with suspicion but no warrant with the approval of a parole officer who arrived part way through the search); *Ochoa*, 792 N.W.2d at 262–63 (involving police officer conducting a suspicionless, warrantless search); *Cullison*, 173 N.W.2d at 535 (involving parole and police officer searching with suspicion of a specific new criminal activity). This factor does not transform the case into those involving a detached magistrate, but it helps reduce the evil sought to be eliminated by the search and seizure clause when the decision to search is made by a law enforcement officer. *See Griffin*, 483 U.S. at 876, 107 S. Ct. at 3170, 97 L. Ed. 2d at 719 ("Although a probation officer is not an impartial magistrate, neither is he the police officer . . . ."). There was no evidence that the parole officer in this case was motivated by the goals and purposes of law enforcement.

The specific, articulable concerns of the parole officer giving rise to a reasonable suspicion to support a search derived from information associated with the supervision of parolees. The concerns involved specific behaviors and comments of the parolee, an evaluation of the likelihood of violations of particular parole agreement conditions, and a triggering event in the form of the monitoring bracelet alert. This factor, requiring a particularized concern with specific articulable facts and

reasonable suspicion to support the search, helps prevent arbitrary discretionary searches under the search and seizure clause.

The immediacy of the government concerns were derived from the general mission of parole supervision. The supervision of parolees requires intervention "at the first sign of trouble" and "at an earlier stage of suspicion." *Id.* at 883, 107 S. Ct. at 3173, 97 L. Ed. 2d at 723 (Blackmun, J., dissenting). "[R]esearch suggests that more intensive supervision can reduce recidivism." *Id.* at 875, 107 S. Ct. at 3169, 97 L. Ed. 2d at 718 (majority opinion). Moreover, delays in searching can reduce the deterrent effect provided by prompt searches. *Id.* at 876, 107 S. Ct. at 3170, 97 L. Ed. 2d at 719.

We recognize there are other less intrusive means for probation officers to discover whether or not a parolee is violating a provision in the parole agreement prohibiting drug use. The collection of a substance from the body for drug testing is one such means, as the facts of this case disclose. However, the supervision of a parolee requires latitude and real-time responses. A response geared to the discovery of drugs in a house can present a more comprehensive view of the problems that need to be addressed by a parolee for the parole officer. A different picture is presented for the parole officer by the discovery of drugs in the home of a parolee than from the detection of drugs in the blood or urine of a parolee, including a means to gauge the severity of the relapse. Thus, a search can provide a better vehicle than drug testing to meet the legitimate concerns of government.

The balance of the three factors from *Jones* is critical to our finding a special need to allow narrowly tailored parolee searches. *See* 666 N.W.2d at 145–46. Overall,

> the question in every case must be whether the balance of legitimate expectations of privacy, on the one hand, and the State's interests in conducting the relevant search, on the other, justifies dispensing with the warrant and probable-cause requirements that are otherwise dictated by the [Search and Seizure Clause].

*Samson*, 547 U.S. at 864, 126 S. Ct. at 2206–07, 165 L. Ed. 2d at 267. On balance, we conclude parole officers have a special need to search the home of parolees as authorized by a parole agreement and not refused by the parolee when done to promote the goals of parole, divorced from the goals of law enforcement, supported by reasonable suspicion based on knowledge arising out of the supervision of parole, and limited to only those areas necessary for the parole officer to address the specific conditions of parole reasonably suspected to have been violated. The facts of this case satisfy this narrowly tailored standard. We do not address the application of this standard to probationers or how the scope of the search might be affected by the expectations of privacy held by others living in the same home. Accordingly, we affirm the judgment of the district court.

## IV. Conclusion.

We adopt a special-needs exception that authorizes parole officers to search the home of a parolee without a warrant for purposes of parole supervision. We affirm the judgment and sentence of the district court.

**AFFIRMED.**

Waterman, Mansfield, and Zager, JJ., join this opinion. Mansfield, J., files a separate concurring opinion in which Waterman, J., joins. Appel, J., files a dissenting opinion in which Wiggins and Hecht, JJ., join.

**MANSFIELD, Justice (concurring specially).**

I join the court's opinion. While I would also sustain the search for the reasons set forth in my dissent in *State v. Baldon,* 829 N.W.2d 785, 835–47 (Iowa 2013) (Mansfield, J., dissenting), I realize the court has taken a different view. I concur in the court's well-reasoned analysis and application of the special-needs doctrine.

Waterman, J., joins this special concurrence.

**APPEL, Justice (dissenting).**

I respectfully dissent.

I begin with a survey of what I regard as cardinal first principles of search and seizure law under article I, section 8. Second, I examine the degree to which the majority opinion conforms to those principles. Third, I suggest alternative approaches to the problems presented in this case. Finally, I emphasize the importance of narrowly interpreting the significance of this case.

## I. Principles of Search and Seizure Law.

**A. Overview of the Warrant Requirement.** I begin with a brief review of the language of our search and seizure provision in article I, section 8, which states:

> The right of the people to be secure in their persons, houses, papers and effects, against unreasonable seizures and searches shall not be violated; and no warrant shall issue but on probable cause, supported by oath or affirmation, particularly describing the place to be searched, and the persons and things to be seized.

Iowa Const. art. I, § 8.

The warrant clause of article I, section 8 has a number of substantive constitutional requirements. First, there must be probable cause for a search. *Id.* Second, the warrant must describe with particularity the place to be searched. *Id.* Third, the warrant must describe with particularity the persons and things to be seized. *Id.*

Each of these substantive requirements has independent constitutional importance. The gateway requirement of probable cause of course serves to limit government discretion and avoid general searches. The particularity requirements, however, are also constitutionally essential. They are proportionality requirements. Even

when gateway probable cause is present, the proportionality requirements of article I, section 8 serve to ensure that when a search is warranted, the search is limited in scope by the nature of the underlying problem. For instance, with respect to place, a warrant with ample probable cause to search a "silver in color passenger train car" for evidence of gambling infractions does not authorize the search of a nearby "red caboose." *Long v. State*, 132 S.W.3d 443, 444–45, 447, 451 (Tex. Crim. App. 2004) (internal quotation marks omitted). As to items, a warrant to search for drugs does not authorize the officer to seize checks, a social security card, or other items of identification. *People v. Pitts*, 13 P.3d 1218, 1220, 1223–24 (Colo. 2000) (en banc).

The genius of the gateway and proportionality requirements is that the government must satisfy these requirements before a neutral and detached magistrate. *See State v. Short*, 851 N.W.2d 474, 502 (Iowa 2014). This eliminates the risk of ex post facto explanations that conform to the nature of the evidence ultimately found and ensures the decision regarding compliance with constitutional norms is made before a person not "engaged in the often competitive enterprise of ferreting out crime." *Johnson v. United States*, 333 U.S. 10, 14, 68 S. Ct. 367, 369, 92 L. Ed. 436, 440 (1948). As was noted by Judge Hufstedler some time ago, "The requirement that [a probation] officer articulate his reasons for making a search before he searches is a substantial deterrent to impulsive and arbitrary official conduct and a real safeguard against after-the-fact justifications." *Latta v. Fitzharris*, 521 F.2d 246, 257 (9th Cir. 1975) (Hufstedler, J., dissenting). The risk of ex post facto explanations is very real. It is, of course, a fundamental principle of search and seizure law that the validity of the search is not affected by what it turns up. As we stated long ago, "No amount of incriminating

evidence, whatever its source, will supply the place of [a] warrant." *McClurg v. Brenton*, 123 Iowa 368, 372, 98 N.W. 881, 882 (1904); *see also United States v. Di Re*, 332 U.S. 581, 595, 68 S. Ct. 222, 228–29, 92 L. Ed. 210, 220–21 (1948). Yet, when incriminating evidence is found, there is a temptation to manipulate the facts or distort search and seizure law in order to uphold the search and sustain the resulting criminal conviction. That is why in *Johnson*, the United States Supreme Court held a warrantless search was invalid even though there was likely ample probable cause to support the search. 333 U.S. at 13–15, 68 S. Ct. at 368–69, 92 L. Ed. at 440–41. As Justice Frankfurter noted, "[T]he safeguards of liberty have frequently been forged in controversies involving not very nice people." *United States v. Rabinowitz*, 339 U.S. 56, 69, 70 S. Ct. 430, 436, 94 L. Ed. 653, 662 (1950) (Frankfurter, J., dissenting), *overruled on other grounds by Chimel v. California*, 395 U.S. 752, 768, 89 S. Ct. 2034, 2042–43, 23 L. Ed. 2d 685, 696–97 (1969). " '[T]he procedure of antecedent justification . . . is central to the Fourth Amendment.' " *Katz v. United States*, 389 U.S. 347, 359, 88 S. Ct. 507, 515, 19 L. Ed. 2d 576, 586 (1967) (quoting *Osborn v. United States*, 385 U.S. 323, 330, 87 S. Ct. 429, 433, 17 L. Ed. 2d 394, 400 (1966)).

As a result, whenever the warrant requirement is found to be inapplicable, many important restrictions on governmental power are lost. Not only is the gateway requirement of probable cause at risk, so too is the proportionality requirement. Further, the requirement that the government explain the basis for the search before it occurs in order to avoid post hoc explanations is totally lost. That is why in *Short*, we reinvigorated what is sometimes called the "warrant preference" approach to search and seizure law under article I, section 8. 851 N.W.2d at 497; *see generally* James J. Tomkovicz, *Divining and Designing*

*the Future of the Search Incident to Arrest Doctrine: Avoiding Instability, Irrationality, and Infidelity*, 2007 U. Ill. L. Rev. 1417 (2007) (advocating the warrant preference approach as the best interpretation of search and seizure law).

**B. Constitutional Provisions Related to Search and Seizure Limit Arbitrary Exercise of Government Power.** Historically, the Crown's claimed authority to engage in sweeping searches for violations of British mercantile policies toward the colonies was a central cause of the American Revolution. *See State v. Ochoa*, 792 N.W.2d 260, 271 (Iowa 2010). The focus of the famous *Paxton's Case* was the legality of writs of assistance, "which gave customs officers open-ended authority to search homes for evidence of customs violations." *Id.* (citing Tracey Maclin, *The Complexity of the Fourth Amendment: A Historical Review*, 77 B.U. L. Rev. 925, 946 (1997)). When James Otis delivered his famous defense in *Paxton's Case*, calling for specific warrants and characterizing " 'the freedom of one's house' " as among " 'the most essential branches of English liberty,' " *id.* (quoting William J. Cuddihy, *The Fourth Amendment: Origins and Original Meaning, 602–1791*, at 377–78 (2009) [hereinafter Cuddihy]), the rhetoric moved a young lawyer attending the court session, John Adams, to later declare, " '[t]hen and there the Child Independence was born,' " *id.* at 272 (quoting Jacob W. Landynski, *Search and Seizure and the Supreme Court: A Study in Constitutional Interpretation* 37 (1966) [hereinafter Landynski]). What is clear from the history is that constitutional provisions related to search and seizure were designed to be a *limitation* on government power. Neither article I, section 8 nor the Fourth Amendment is an enabling act extending the reach of government.

The focus of search and seizure law is eliminating arbitrary exercise of government power whenever it might be used. While the text of article I, section 8, like the Fourth Amendment, is challenging, it is clear that the search and seizure strictures are not limited to criminal matters. Other constitutional concepts, like the federal right against self-incrimination, contain express limitations to criminal proceedings. *See* U.S. Const. amend. V. No such limitation is contained in article I, section 8. Article I, section 8 is not a constitutional chameleon that changes color when the government invader presents a civil identification card rather than a badge of law enforcement. The underlying motivation of the government official is not and cannot be the determining factor. As Justice Brandeis taught us years ago, "The greatest dangers to liberty lurk in insidious encroachment by men of zeal, well-meaning but without understanding." *Olmstead v. United States*, 277 U.S. 438, 479, 48 S. Ct. 564, 573, 72 L. Ed. 944, 957 (1928) (Brandeis, J., dissenting); *overruled on other grounds by Katz*, 389 U.S. at 353, 88 S. Ct. at 512, 19 L. Ed. 2d at 583.

In any event, parole officers, like probation officers, have at least two functions. Parole officers may serve the state interest by assisting the parolee to complete parole successfully and be reintegrated into the community. They also serve another purpose, however: ensuring that persons convicted of crimes, who are more likely to engage in criminal activity than members of the public generally, do not commit additional crimes. *See United States v. Knights*, 534 U.S. 112, 120–21, 122 S. Ct. 587, 592, 151 L. Ed. 2d 497, 506 (2001) (recognizing dual concern of the state in context of probationer's residence search). These two purposes of parole officers recognized in *Knights* are conjoined twins and cannot easily be surgically separated. Ordinarily, in search and seizure

jurisprudence, we do not inquire into the subjective motivation of government officials. *See State v. Simmons*, 714 N.W.2d 264, 274 (Iowa 2006). That said, a home visit more likely reflects the function of assisting in a parolee's rehabilitation, while a specific search in private areas of a residence is more likely to be pursuant to the parole officer's law enforcement function.

**C. The Freestanding Reasonableness Clause as Ahistorical and Antithetical to the Constitutional Values of the Warrant Clause.** We discussed the relationship between the reasonableness clause and the warrant clause in *Short*, 851 N.W.2d at 501–02. It simply cannot be that the reasonableness clause is a freestanding provision that trumps the warrant clause. *Id.* Otherwise, the warrant clause would be superfluous. *See Rabinowitz*, 339 U.S. at 70, 70 S. Ct. at 436, 94 L. Ed. at 662 ("One cannot wrench 'unreasonable searches' from the text and context and historic content of the Fourth Amendment."). Indeed, the meaning of reasonableness, certainly at the time of the adoption of the Fourth Amendment to the United States Constitution, from which article I, section 8 was derived, was likely used in the Blackstonian sense and was a stand in for "lawful." *See Short*, 851 N.W.2d at 501.

Those that emphasize reasonableness over the warrant requirement often use a balancing test to determine the applicability of the warrant requirement to broad categories of persons. The categorical reasonableness test allowing courts to make pragmatic assessments of the need for government action balanced against the interests of citizens in determining the applicability of search and seizure requirements is not explicitly mentioned in the text of article I, section 8 or in the Fourth Amendment. The categorical reasonableness test was not invented until relatively recently. *See* T. Alexander Aleinikoff, *Constitutional Law in the*

*Age of Balancing,* 96 Yale L.J. 943, 948 (1987) [hereinafter Aleinikoff] (noting balancing, as a "method of constitutional interpretation, . . . first appears in majority opinions in the late 1930's and early 1940's"). As noted by a leading scholar, reasonableness that engages in relativistic balancing efforts reflects recent, "ideologically-driven judicial choices, not a rendition of the original understanding." Thomas Y. Davies, *Correcting Search-And-Seizure History: Now-Forgotten Common-Law Warrantless Arrest Standards and the Original Understanding of "Due Process of Law,"* 77 Miss. L.J. 1, 224 (2007); *see also* Aleinikoff, 96 Yale L.J. at 948–49.

Categorical balancing tests present a troublesome methodology. A constitutional vision of search and seizure employing categorical balancing fails to zealously protect the rights of citizens because it is not based on transparent and preestablished constitutional norms. Untethered to such norms, categorical balancing is based on a quasi-legislative process in which the court makes pragmatic policy determinations that paternalistically relieve classes of government activity from the central restrictions on government power contained in the warrant requirement of article I, section 8.

Further, categorical or not, balancing tests based upon reasonableness run the risk of being no test at all. An amorphous doctrine based on reasonableness threatens to engulf search and seizure law. *See New Jersey v. T.L.O.*, 469 U.S. 325, 369–70, 105 S. Ct. 733, 757–58, 83 L. Ed. 2d 720, 752–53 (1985) (Brennan, J., concurring in part and dissenting in part); *Rabinowitz,* 339 U.S. at 83, 70 S. Ct. at 443, 94 L. Ed. at 669 ("It is no criterion of reason to say that the district court must find [a search] reasonable."); *see also Skinner v. Ry. Labor Execs.' Ass'n,* 489 U.S. 602, 637, 109 S. Ct. 1402, 1424, 103 L. Ed 2d 639, 673 (1989) (Marshall, J., dissenting) (noting that absent warrant and

probable cause standards, the concept of reasonableness is "virtually devoid of meaning, subject to whatever content shifting judicial majorities, concerned about the problems of the day, choose to give to that supple term"); Anthony G. Amsterdam, *Perspectives on the Fourth Amendment*, 58 Minn. L. Rev. 349, 393 (1974) (stating reliance on reasonableness threatens to turn search and seizure law into "one immense Rorschach blot"). *See generally Short*, 851 N.W.2d at 501–02 (criticizing freestanding reasonableness-clause theory).

**D. Security of the Home as Central to Search and Seizure Protection.** Oh, the words of Pitt the Elder!

> "The poorest man may, in his cottage, bid defiance to all the forces of the Crown. It may be frail; its roof may shake; the wind may blow through it; the storm may enter; the rain may enter; but the King of England may not enter; all his force dares not cross the threshold of the ruined tenement."

*Ochoa*, 792 N.W.2d at 270 (quoting Nelson B. Lasson, *The History and Development of the Fourth Amendment to the United States Constitution* 49–50 (1937)); *see also Short*, 851 N.W.2d at 495–96.

The concept of the home as one's castle was a central part of English law that the colonists brought to the new world. *See Short*, 851 N.W.2d at 501. In his oration in *Paxton's Case*, Otis pronounced that " 'the freedom of one's house' was among 'the most essential branches of English liberty.' " *Id.* (quoting Cuddihy at 377–78). John Adams remembered that Otis argued that the writ of assistance in the case was " 'against the fundamental principles of law, the privilege of house.' " *Ochoa*, 792 N.W.2d at 271 (quoting Landynski at 34).

The concept of a home as one's castle came to Iowa, too. Iowa Governor Robert Lucas stated at the first Iowa constitutional convention that he deemed the most important right was " 'to secure to the poor

man a little spot of ground where he could build him a cottage and have a home for himself and family, free from the fear of being turned out of doors.'" *Id.* at 275 (quoting *Fragments of the Debates of the Iowa Constitutional Conventions of 1844 and 1846*, at 159–61 (1900)). In *McClurg*, we declared, "At the closed door of the home, be it palace or hovel, even bloodhounds must wait till the law, by authoritative process, bids it open." 123 Iowa at 372, 98 N.W. at 882.

There is something about a home that generates poetic language in the context of searches and seizures. The notion of "home sweet home" may seem trite to some, but it is universal in our legal culture. It is no surprise that protection of the home against government intrusion has been declared one of the prime purposes of search and seizure law. In the first substantive search and seizure case, *Boyd v. United States*, the Supreme Court broadly noted that the purpose of the Fourth Amendment is to protect against invasions of "the sanctity of a man's home and the privacies of life" from "government and its employes." 116 U.S. 616, 630, 6 S. Ct. 524, 532, 29 L. Ed. 746, 751 (1886), *abrogated on other grounds by Warden v. Hayden*, 387 U.S. 294, 302, 87 S. Ct. 1642, 1647–48, 18 L. Ed. 2d 782, 789 (1967). As stated more recently in *United States v. United States District Court*, "physical entry of the home is the chief evil against which the wording of the Fourth Amendment is directed." 407 U.S. 297, 313, 92 S. Ct. 2125, 2134, 32 L. Ed. 2d 752, 764 (1972); *see also Kyllo v. United States*, 533 U.S. 27, 37–38, 121 S. Ct. 2038, 2045, 150 L. Ed. 2d 94, 104 (2001); *Welsh v. Wisconsin*, 466 U.S. 740, 750, 104 S. Ct. 2091, 2098, 80 L. Ed. 2d 732, 743 (1984); *Payton v. New York*, 445 U.S. 573, 589–90, 100 S. Ct. 1371, 1381–82, 63 L. Ed. 2d 639, 653 (1980); *Ochoa*, 792 N.W.2d at 277.

**E. The Role of Expectation of Privacy in Determining Applicability of the Warrant Requirement.** In *Katz*, Justice Harlan surprised everyone, perhaps even himself, when he penned a concurring opinion that simply took off and has had a life of its own. 389 U.S. at 360–62, 88 S. Ct. at 516–17, 19 L. Ed. 2d at 587–88 (Harlan, J., concurring). In *Katz*, the United States Supreme court overruled the *Olmstead* case, a highly formalistic opinion which held government eavesdropping did not violate the Fourth Amendment because it involved no physical trespass. *Olmstead*, 277 U.S. at 466, 48 S. Ct. at 568, 72 L. Ed. at 951 (majority opinion); *overruled by Katz*, 389 U.S. at 353, 88 S. Ct. at 512, 19 L. Ed. 2d at 583 (majority opinion). In his concurring opinion, Justice Harlan noted shortcomings in traditional trespass theory in search and seizure jurisprudence. *Katz*, 389 U.S. at 362, 88 S. Ct. at 517, 19 L. Ed. 2d at 588 (Harlan, J., concurring). He stated that the Fourth Amendment also protected "reasonable expectations of privacy." *Id.*

Justice Harlan plainly never intended his formulation to replace all previous search and seizure law. His phrase was designed to *supplement* existing law and *extend* search and seizure protections to include government eavesdropping. *See generally Short*, 851 N.W.2d at 504 (explaining that the reasonable expectation of privacy standard was not designed to dilute search and seizure protections). In *United States v. White*, Justice Harlan made it clear that all intrusions significantly jeopardizing Fourth Amendment liberties should require a warrant. 401 U.S. 745, 786–87, 91 S. Ct. 1122, 1143, 28 L. Ed. 2d 453, 478 (1971) (Harlan, J., dissenting).

In a remarkable turn of events, Justice Harlan's "reasonable expectations of privacy" somehow became *the* test of the scope of the

Fourth Amendment. And, in one of the great ironies of Fourth Amendment jurisprudence, it was now used as a tool to reduce the reach of Fourth Amendment protections! The test became a legal boomerang in the hands of a later Supreme Court.

It may well be the time has come to abandon the reasonable-expectations-of-privacy test. Although born with the best of intentions and with excellent pedigree, it has been on legal parole now for a number of years. The reasonable-expectations-of-privacy test runs the risk of converting search and seizure law into a mere notice requirement. Indeed, in *California v. Carney*, the United States Supreme Court declared, improbably, that pervasive public regulation of automobiles and their drivers through licensure, registration, equipment regulation, and rules of the road puts drivers "on notice" that the passenger compartment, which has nothing to do with registration, equipment or rules of the road, may be searched without a warrant. 471 U.S. 386, 391–92, 105 S. Ct. 2066, 2069–70, 85 L. Ed. 2d 406, 413–14 (1985).

The time has probably come to revoke parole on the reasonable-expectations-of-privacy test. No warrant required. The better approach to privacy is that provided by the Oregon Supreme Court, which has declared that the issue is not the privacy one reasonably expects, but the privacy to which one has a right to enjoy. *State v. Tanner*, 745 P.2d 757, 762 n.7 (Or. 1987) (en banc); *see Short*, 851 N.W.2d at 504. Alternatively, the analysis could focus on the text: the right of citizens to be "secure" in their houses, papers, and effects. *See* Thomas K. Clancy, *Fourth Amendment: Its History and Interpretation* 47 (2008); *Ochoa*, 792 N.W.2d at 277. Such an approach would be consistent with the original purpose of the reasonable-expectations-of-privacy test in *Katz*. *See* 389 U.S. at 362, 88 S. Ct. at 517, 19 L. Ed. 2d at 588.

**F. Exceptions to the Warrant Requirement.** While the warrant requirement is central to search and seizure law, there have been well-recognized exceptions to it, including searches and seizures incident to arrest and arising from exigent circumstances when, for instance, crime is ongoing or, the health and safety of individuals are imminently threatened. We have repeatedly stated, however, that warrantless searches are "virtually 'per se unreasonable . . . subject only to a few specifically established and well-delineated exceptions.'" *State v. Baldon*, 829 N.W.2d 785, 791 (Iowa 2013) (quoting *Schneckloth v. Bustamonte*, 412 U.S. 218, 219, 93 S. Ct. 2041, 2043, 36 L. Ed. 2d 854, 858 (1973)). These exceptions, however, must be jealously guarded and "carefully drawn." *State v. Strong*, 493 N.W.2d 834, 836 (Iowa 1992).

We have of course recognized exceptions to the warrant requirement, and I do not quarrel with the proposition that they exist. However, as in *Camara v. Municipal Court*, an exception to the warrant requirement generally requires that the government demonstrate it is simply inherently impracticable to obtain a warrant to accomplish the compelling governmental mission. 387 U.S. 523, 536–39, 87 S. Ct. 1727, 1735–36, 18 L. Ed. 2d 930, 940–41 (1967). For instance, it would be impossible to obtain a warrant prior to a *Terry*-type pat down without arresting the suspect. *Terry v. Ohio*, 392 U.S. 1, 20, 88 S. Ct. 1868, 1879, 20 L. Ed. 2d 889, 905 (1968). In *Camara*, it would have been impossible to obtain a warrant based upon probable cause at a specific location because, while there certainly was an infestation within the geographic area, there was no way to determine which specific residence was experiencing the problem. *See* 387 U.S. at 536–38, 87 S. Ct. at 1735, 18 L. Ed. 2d at 939–41. A search incident to arrest must

necessarily occur simultaneously with the arrest, not after the passage of time required to obtain a warrant.

In considering exceptions to the warrant requirement, there is a distinction between inherent impracticability and mere inconvenience. Obtaining a warrant is always inconvenient in the sense that it imposes some burdens on law enforcement. If mere inconvenience were enough to excuse the warrant requirement, there would be little left of it. Instead, inherent impracticability requires that, given the nature of the problem and the policy being advanced, one simply cannot get a warrant based on probable cause prior to the search.

The question of inherent impracticability of obtaining a warrant was considered in a study of probation in Wisconsin. The survey found that a warrant requirement would not unduly burden probation officers. Howard P. Schneiderman, *Conflicting Perspectives from the Bench and the Field on Probationer Home Searches*—Griffin v. Wisconsin *Reconsidered,* 1989 Wis. L. Rev. 607, 664 (1989). There is no reason to think a different result would occur in the context of parole.

**G. Rejection of Act of Grace, Waiver, or Constructive Custody Theories for Parolees.** Finally, it is important to note that we have rejected the theories that parolees are not entitled to search and seizure protections because they are in "constructive custody," have "waived" their search and seizure rights, or are on parole only through "an act of grace." *See Ochoa,* 792 N.W.2d at 290–91. In *Ochoa,* we rejected all these theories, noting that although the state may have the power to imprison a parolee, the fact that the parolee is released into the community is the overriding factor for search and seizure analysis. *See id.*

**II. Analysis of the Majority Opinion in Light of Search and Seizure Principles.**

Unfortunately, the majority opinion does not apply many of the above principles in a straightforward fashion. The constitutional value of a warrant—not simply the probable cause determination, but also the proportionality requirements and the requirement of justification before the fact—is not considered. The majority opinion on occasion, citing United States Supreme Court precedent, flirts with a version of "reasonableness" though ultimately rejects its most protean rendition in a footnote. Further, the majority does not seem to recognize the constitutional importance of the house-as-a-castle doctrine. And, it ironically uses the concept of reasonable expectations of privacy as a sword to cut at the core of search and seizure protection in the home.

While the majority uses "special needs" to support its result, it glides over the critical question, namely, whether it is inherently impracticable to obtain a warrant or just inconvenient. Further, it does not address the fact that parole officers have two functions, including a law enforcement function.

The majority seeks to limit the scope of the powers of parole officers in several ways. It requires "reasonable suspicion." Reasonable suspicion is a tool of particularity that can help cabin government conduct. *See Baldon*, 829 N.W.2d at 823 (Appel, J., specially concurring); *Ochoa*, 792 N.W.2d at 273. Reasonable suspicion is said to exist when "articulable facts which, taken together with the rational inferences from those facts, would warrant a reasonably prudent officer" to investigate further. *Maryland v. Buie*, 494 U.S. 325, 334, 110 S. Ct. 1093, 1098, 108 L. Ed. 2d 276, 286 (1990). It is something more than a hunch, but something less than probable cause. *See State v. Tague*, 676 N.W.2d 197, 204 (Iowa 2004) (detailing reasonable suspicion standard);

Craig S. Lerner, *Reasonable Suspicion and Mere Hunches*, 59 Vand. L. Rev. 407, 459–60 (2006) (same). An officer's subjective belief that he or she has sufficient suspicion to justify the intrusion is insufficient to satisfy the reasonable suspicion standard. *See Terry*, 392 U.S. at 22, 88 S. Ct. at 1880, 20 L. Ed. 2d at 905–06.

However, here, there was no more than a hunch, especially after the parole officers determined the ankle bracelet was functioning properly and King had a reasonable explanation for why he had been in his residence for the last two days. My view is consistent with a number of cases. For instance, in *People v. Thornburg*, probation officers recovered pornographic DVDs in a search of a probationer's bedroom. 895 N.E.2d 13, 14–15 (Ill. App. Ct. 2008). Although the home visit, pursuant to a probation agreement, was not cited as raising a constitutional problem, the search of the bedroom was invalid because it lacked reasonable suspicion. *Id.* at 19. In *United States v. Payne*, the United States Court of Appeals for the Sixth Circuit held that the defendant's two prior drug convictions and an anonymous tip did not amount to reasonable suspicion. 181 F.3d 781, 789–91 (6th Cir. 1999). One court noted that a factor in determining whether a search was based on reasonable suspicion or a hunch was whether a parolee had a reasonable explanation for his whereabouts, which was certainly present in this case. *See Commonwealth v. Edwards*, 874 A.2d 1192, 1196 (Pa. Super. Ct. 2005).

### III. Alternative Constitutional Visions.

**A. Approach in *Cullison*.** In my view, it would have been far easier, far simpler, and far more consistent with search and seizure constitutional norms, to simply follow the rule in *State v. Cullison*, 173 N.W.2d 533 (Iowa 1970). In *Cullison*, we rejected stripping or diluting the

rights of parolees based on "what may best be described as a socio-juristic rationalization, i.e., protection of the public and constructive custody." *Id.* at 536. Such an approach was not "constitutionally sound, reasonable, fair or necessary." *Id.* We further stated that the " 'dilution' theory begins and ends nowhere, being at best illusory and evasive." *Id.* Plainly, in *Cullison,* we rejected a categorical balancing test based on "reasonableness." *See id.*

The majority opinion in this case flies directly against the *Cullison* precedent. It does precisely what *Cullison* cautioned against, namely it dilutes the search and seizure protections of parolees based upon "socio-juristic rationalization." *See id.* It is error to do so.

**B. The Home Visit: Differentiating Between Parole Officers' Functions of Rehabilitation and Law Enforcement.** The majority opinion evinces a pragmatic concern for the benevolent role of parole officers. No doubt, parole officers, like the government officers in *Knights* performing a search of a probationer's residence, perform a dual function of rehabilitating parolees while also ensuring that the law is enforced. *See* 534 U.S. at 120–21, 122 S. Ct. at 592, 151 L. Ed. 2d at 506. Ordinarily, it is difficult to separate dual purposes, and *Cullison* stands for the proposition that we should not try to do so.

But there is an alternative constitutional vision. Under that vision, a home visit is not a search. The purpose of the home visit is to meet with the parolee and determine the status of the parolee in his or her rehabilitation effort. When a parole officer begins to look into places in the residence outside common areas, such as bedrooms, however, the law enforcement function objectively predominates and a warrant is required.

There is support for this theory in caselaw. A number of cases hold that a home visit by a parole officer is not a search. *See, e.g., United States v. LeBlanc*, 490 F.3d 361, 367 (5th Cir. 2007); *Fitzharris*, 521 F.2d at 250; *State v. Moody*, 148 P.3d 662, 666–67 (Mont. 2006). A home visit in areas in which visitors are commonly entertained is likely to be conducted for benevolent purposes of parole, namely, assisting the parolee in completing parole and reintegrating into the community. A visit in private areas of the residence, however, is more likely to be a law enforcement function. Thus, under this line of cases, the authority to conduct a home visit in areas in a residence in which visitors are customarily allowed does not carry with it the authority to conduct a search of private areas of the residence. *See State v. Guzman*, 990 P.2d 370, 373–74 (Or. Ct. App. 1999) ("[T]he authority to conduct a home visit under the conditions of probation does not encompass the authority to conduct a search."). The home visit, however, cannot be used as a subterfuge to avoid the probable cause burden that must be met to support an investigative search. "Once the purpose behind the search shifts from a home visit to a quest for evidence to be used in a criminal prosecution, the [government] may only enter the premises upon securing a warrant supported by full probable cause." *Commonwealth v. Young*, No. CRIM. A. 98-11253, 1999 WL 218423, at *3 (Mass. Super. Ct. Mar. 30, 1999).

**C. Lack of Reasonable Suspicion.** A third constitutional vision simply requires that the concept of reasonable suspicion have some teeth. In this case, the facts supporting reasonable suspicion, particularly after the ankle bracelet issue was resolved, were rather thin. The difference between reasonable suspicion and a hunch is difficult to describe, perhaps, but in this case, the evidence falls short of what is

required to support a warrantless search. This is particularly so given our general admonition, expressed years ago, that we give the search and seizure provisions of article I, section 8 "a broad and liberal interpretation for the purpose of preserving . . . liberty." *State v. Height*, 117 Iowa 650, 661, 91 N.W. 935, 938 (1902).

## IV. Narrow Interpretation of This Case.

Finally, I note that the majority opinion is extremely limited. It does not apply to the activities of law enforcement. It does not endorse freestanding reasonableness, a hungry beast that could threaten the warrant requirement. It is limited to a search for drugs when the underlying crime for which the parolee was convicted is a drug offense and when the particularity requirement of reasonable suspicion has been determined to be present. It reserves the question of whether a parolee has a right to refuse the search. Most importantly, this case should not be seen as a wholesale adoption of so-called "special needs" as developed by the ever-expanding cases of the United States Supreme Court.

For the reasons stated above, I dissent.

Wiggins and Hecht, JJ., join this dissent.